2022 IL App (1st) 210534

No. 1-21-0534

Third Division
November 23, 2022

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 02 CR 11395 03 |
| v. | ) ) | |
| | ) | The Honorable |
| DESHANTA YOUNG, | ) ) | James B. Linn, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Reyes and Burke concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a bench trial, defendant, Deshanta Young, was found guilty of aggravated kidnapping for ransom, aggravated kidnapping while armed with a firearm, and aggravated unlawful restraint. He was sentenced to 20 years for aggravated kidnapping for ransom, 20 years for aggravated kidnapping while armed with a firearm, and 7 years for aggravated unlawful restraint, to be served concurrently in the Illinois Department of Corrections (IDOC). Defendant was tried separately from his four codefendants—Cameron Fulwiley, Sedgwick

Williams, Rashon Stokes, and Kelwyn Sellers—who were acquitted following a bench trial before the same trial court.

¶ 2 At the codefendants' trial, the State presented only the testimony of the complaining witness, Dale Bragg, whose account of the kidnapping the trial court found insufficiently credible in the absence of any corroboration to find the codefendants guilty beyond a reasonable doubt. At defendant's trial, however, the State presented testimony from Bragg as well as the prior statement and testimony of an additional witness, Cassandra Johnson. The trial court found this additional evidence to be sufficient corroboration of Bragg's testimony and found defendant guilty of the foregoing offenses.

¶ 3 On direct appeal, this court vacated defendant's conviction for aggravated unlawful restraint, but affirmed his other convictions and associated sentences. *People v. Young*, No. 1-04-2540 (Dec. 26, 2006) (unpublished order under Illinois Supreme Court Rule 23). In 2009, defendant filed a *pro se* petition seeking postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)), which was summarily dismissed. This court affirmed. *People v. Young*, No. 1-09-1085 (2011) (unpublished order under Illinois Supreme Court Rule 23). In 2014, defendant sought leave to file a successive postconviction petition alleging, among other things, actual innocence and ineffective assistance of appellate counsel for failure to challenge the sufficiency of the evidence on direct appeal. The trial court docketed defendant's successive petition and advanced it to the second stage of postconviction proceedings, but then granted the State's motion to dismiss. Defendant appeals from that dismissal, arguing that the trial court erred in dismissing his claims without an evidentiary hearing. For the reasons that follow, we affirm the decision of the trial court.

¶ 4                                    BACKGROUND

¶ 5        This court has twice considered issues related to defendant's convictions for aggravated kidnapping for ransom, aggravated kidnapping while armed with a firearm, and aggravated unlawful restraint. A detailed recitation of the evidence and trial testimony can therefore be found in our prior orders, which we hereby incorporate by reference and from which the following relevant facts are drawn. *Young*, No. 1-04-2540; *Young*, No. 1-09-1085.

¶ 6                                      I. Trial

¶ 7        The complaining witness, Dale Bragg, testified that he had been convicted of two felonies, namely, armed robbery and forgery. After serving a 15-year sentence for the armed robbery conviction, Bragg worked for a time as an FBI informant. Although he was originally paid for his work for the FBI, he ceased to be paid for his involvement at the time of trial due to his arrest for drug conspiracy. Bragg testified that at the time of alleged kidnapping, he considered himself a drug "broker" with access to large amounts of cocaine and heroin.

¶ 8        Bragg testified that before the alleged kidnapping, he had introduced codefendant Stokes to a man named "Albini" to facilitate a heroin transaction. Albini subsequently claimed that Stokes owed him around $2,200 and asked Bragg to collect the money from Stokes. On April 11, 2002, Bragg arranged a meeting at Stokes' home on South Morgan Street in Chicago to effectuate a heroin transaction. When Bragg arrived at the porch of Stokes' home at around 8:40 p.m., codefendants Williams and Sellers placed a gun to Bragg's head and demanded the keys to Bragg's black Lincoln Town Car. Once inside the vehicle, Williams and Sellers threatened Bragg's life if he did not give them drugs and money.

¶ 9        Williams and Sellers then drove Bragg at gunpoint to the home of codefendant Fulwiley and witness Cassandra Johnson, which Bragg later learned was located in Harvey, Illinois.

Williams and Sellers brought Bragg down to the basement of the house, where defendant was waiting with Fulwiley and Stokes. Bragg identified defendant in court as one of the men who was present at Fulwiley's house in Harvey. Bragg testified that the group interrogated him in order to find out where he stored the drugs. Bragg told them he did not have any drugs, but that he could call a few of his connections to obtain some. The group brought him to the main floor of the house and locked him a bedroom closet. Later, Bragg was taken out of the closet, and Williams hit Bragg in the head with a shoe. Eventually, Bragg told the group that some drugs were buried outside his condominium located in downtown Chicago. However, Bragg testified that this statement was a lie, and that he instead hoped that the group would be observed digging around his building and that they would be arrested.

¶ 10    Defendant, Williams, Sellers, and Stokes left Fulwiley's house to find the drugs that were supposedly buried near Bragg's condominium, but Fulwiley remained with Bragg and offered him some food. Fulwiley and Bragg discovered that they had some acquaintances in common. Fulwiley allowed Bragg to sit on the bed and watch television. However, after Fulwiley received a telephone call telling him that the men could not find the drugs, he placed Bragg back into the closet. When the group returned, they took Bragg out of the closet, and Williams hit Bragg on the head with a gun and accused him of lying. Defendant yelled at Bragg. Williams tied Bragg's hands and feet together with Bragg's shoelaces and placed him in the closet again. Williams then told Bragg that he needed to come up with either drugs or money. Defendant, Williams, and Stokes left the house, while Sellers and Fulwiley remained with Bragg.

¶ 11    While still in the closet, Bragg explained to Fulwiley that the group must have looked for the drugs in the wrong place and suggested that Fulwiley and Sellers take him to his

4

condominium so that he could show them where to find the drugs. Fulwiley untied Bragg and drove him to the condominium. Sellers accompanied them on the drive and held a gun to Bragg's head during the trip. Outside the condominium, Bragg fumbled around in the bushes near a window in a failed attempt to set off a security alarm. Bragg then returned to the vehicle where Fulwiley and Sellers sat and asked to use one of their cell phones to place a call to obtain drugs. Bragg used one of Fulwiley's or Sellers' cell phones to make the call as the men drove back to Fulwiley's home in Harvey. However, instead of placing a call to a drug dealer, Bragg left a cryptic request with his contact at the FBI, for whom he had worked as an informant.

¶ 12     Upon returning to Fulwiley's house, Bragg discussed with Fulwiley a plan to obtain drugs using bundles of fake money. Sellers then went home for the evening, and Fulwiley told Bragg to sleep on the living room couch, which was close to the front door of the house. The doors to the house were locked, but the bedroom doors were left open so Fulwiley and Johnson could check on Bragg. Bragg testified that he did not attempt to leave the house at that time because he did not have his keys, his vehicle, or his identification.

¶ 13     On the morning of April 12, 2002, Bragg awoke before Fulwiley or Johnson and took a cordless phone from the residence into the kitchen to call 911. He informed the Harvey police that he had been kidnapped and gave them a phone number to reach his FBI contact. Shortly thereafter, Fulwiley received a phone call, tied Bragg up again, and placed him back into the closet. Defendant, Williams, and Stokes then returned to the house. Fulwiley told them about Bragg's plan to use bundles of fake money to obtain drugs.

¶ 14     Bragg began to cut up phone book pages into the size of money, placed the fake currency in a bag, and covered it with some real money. Bragg then used his cell phone to place another call to his FBI contact pretending to the group as though he was contacting a drug dealer. Bragg

5

arranged a location to meet his FBI contact. Fulwiley placed a gun in the glove compartment of Bragg's Lincoln Town Car and he and Bragg proceeded to the exchange location near the University of Illinois at Chicago (UIC) campus. Williams followed them in another vehicle, while defendant and Stokes followed in a third vehicle. As the vehicles approached their destination, FBI agents stopped Fulwiley, Bragg, and Williams, but were unaware of the third vehicle carrying defendant and Stokes. Defendant and Stokes drove off after observing the agents stop the other vehicles. Bragg explained to the agents that he had been kidnapped and told them of the house in Harvey where he was held. Bragg identified defendant in a photo array as one of the participants.

¶ 15    The following day, Harvey police observed defendant in the passenger seat of a vehicle. The officer stopped the vehicle and found that Stokes was the driver. After a search of the vehicle, the officer found two loaded handguns located under the hood of the vehicle. Defendant and Stokes were placed under arrest.

¶ 16    FBI agent Lewis Reinhardt and Chicago police officers Jeff Phillips and Robert Montgomery testified about conducting the April 12, 2002, stop of two vehicles and arresting Fulwiley and Williams. Officer Phillips recovered a firearm in the glove compartment of the black Lincoln Town Car driven by Bragg. The parties also stipulated to the introduction of FBI agent Jay Darin's testimony at the codefendants' earlier trial describing the stop and the arrests. Agent Darin testified that on the morning of April 12, 2002, he noticed that he had received calls from Bragg's phone number early that morning, around 2:00 or 3:00 a.m., but Bragg did not leave a message. He learned that the Harvey police had reported that Bragg had been kidnapped, and he called Bragg's phone repeatedly that morning. Eventually, Bragg answered

6

and said he was near the UIC campus. Agent Darin and other agents and officers drove around UIC, spotted Bragg's vehicle, and effectuated the stop.

¶ 17    Officer Montgomery testified about executing a search warrant at Fulwiley's house in Harvey. Cassandra Johnson was the only civilian present at the house at that time. There, police officers recovered 13 clear plastic bags of rocks of cocaine in a cigarette pack.

¶ 18    Law enforcement officers also interviewed Johnson. At trial, Johnson's statement to law enforcement officers was admitted into evidence and read to the trial court by an Assistant State's Attorney. In the signed, handwritten statement dated April 13, 2002, Johnson stated that defendant and Williams came into her house on the evening of April 11, 2002, both carrying guns. The two went into the bedroom where she heard defendant yelling that he was going to "merk" Bragg, which she understood as meaning to "kill," after he picked up the "stuff," meaning drugs. She also stated that when defendant and Williams returned after searching for drugs outside of Bragg's condominium, defendant had a gun in his hand and yelled that he should take Bragg down the street and kill him. Johnson explained that Fulwiley convinced defendant not to kill Bragg, and defendant then left the house. Johnson stated that Fulwiley told her that defendant, Williams, and Stokes had kidnapped Bragg in order to rob him of drugs. Fulwiley also told Johnson of Bragg's plan to buy drugs using bundles of fake money. She further claimed that less than two hours after Bragg, Fulwiley, and Williams left the house for the fake drug deal, defendant called her and told her to remove everything from the house, and that if anyone came to the house to say that she did not know anything.

¶ 19    At trial, Johnson testified that the statement she made to law enforcement was only partially true. She testified that on April 12, 2002, 10 to 15 police officers came to Johnson's house where she lived with Fulwiley. The officers found drugs and a police officer told her that if she

7

did not cooperate, she would be charged with possession of the drugs and kidnapping. The police officer also said the police would call the Department of Children and Family Services, which would take away her children, and she would go to prison. The officer looked at Johnson's phone and observed defendant's name on the phone and said, "I got that [expletive] before, I'm going to get that [expletive] again. I'm going to get his ass." Johnson was then taken to the police station where she testified that she was in a small room for about 18 hours and did not sleep or eat during that time. She testified that she first told the police that defendant was not involved, but the police threatened her, so she made the statement implicating him. Johnson denied saying that defendant was violent or that he had threatened her. She testified that her statement was written by an assistant state's attorney, and then read and signed by her.

¶ 20        At the close of State's evidence, the defense moved for a directed finding of not guilty, characterizing Bragg as a "shifty, shady and slick character" and "one of the worst witnesses I have ever seen." While ruling on the motion, the court stated that it agreed with defense counsel's characterization of Bragg, and further "acknowledge[d] that Mr. Bragg, his word by itself, I don't believe would ever be enough to find anybody guilty of anything beyond a reasonable doubt." However, the court denied the motion, explaining that in contrast to the State's case at the codefendants' earlier trial, Bragg's testimony at defendant's trial was corroborated by Johnson's statement and the weapons and fake money recovered by police further corroborated Bragg's testimony.

¶ 21        The defense called one witness, codefendant Williams. Williams testified that at around 11:00 p.m. on April 11, 2002, he received a call from Fulwiley. Fulwiley told him about a friend of his who wanted to "rip off" somebody to whom he owed money. Williams went to Fulwiley's house in Harvey and observed Fulwiley, along with the person he now knows as

8

Bragg, and a person named "Ralph," who he testified is Johnson's cousin. Fulwiley told Williams of the plan to use fake money to purchase drugs from a person that Bragg had contacted. Williams testified that when Bragg made a phone call, Williams heard the voice on the other end say that Bragg could not receive more drugs until Bragg paid off his tab, which was around $32,000. Bragg responded that he would pay that and more to obtain three "keys" and 400 grams of "dope." According to Williams, the plan was to split the proceeds from the bogus drug transaction using the fake money. Bragg said he would stay at Fulwiley's house that night, and they could all go together in the morning to complete the drug transaction using the fake money. Williams then left the house. When Williams returned to the house on the morning of April 12, 2002, he observed Fulwiley and Bragg making fake money out of pages of a telephone book. Williams testified that it was Bragg's idea to bring a gun to the location of the fake drug transaction. Bragg and Fulwiley left the house in Bragg's black Lincoln Town Car and Williams left in his vehicle, while Ralph remained at the house. Williams was stopped in his vehicle by law enforcement officers and arrested near UIC. Williams further testified that he had known defendant for several years and he did not observe him at Fulwiley's house in Harvey on April 11 or 12, 2002.

¶ 22    The court found defendant guilty of aggravated kidnapping for ransom, aggravated kidnapping with a firearm, and aggravated unlawful restraint. The court found that although Bragg was a "manipulative double dealer," his account of the kidnapping was corroborated: Bragg had been "held … secretly against his will" "in a basement in Harvey" where he was "threatened and coerced into doing certain things." The court further remarked that Bragg is "a selfish unscrupulous person trying to maneuver and out maneuver and double deal people at the same time." But the court noted that Bragg's account was supported by the fake money

9

and guns recovered during his arrest as well as by Johnson's statement, which "corroborate[d] the basic facts about what happened in Harvey." The court further found that, although police spoke to Johnson "in a hard cold adult way," they only "persuaded" her to tell the truth about what she knew, not to "make up some conspiracy against innocent people that they [we]re trying to frame." Finally, the court acknowledged that it had reached a different result in the codefendants' trial and explained that it did so because it viewed Bragg's account as incredible until it was corroborated by Johnson, who did not testify at the earlier trial.

¶ 23    As noted, the trial court sentenced defendant to 20 years for aggravated kidnapping for ransom, 20 years for aggravated kidnapping while armed with a firearm, and 7 years for aggravated unlawful restraint, to be served concurrently.

¶ 24                    II. Direct Appeal and Prior Collateral Proceedings

¶ 25    On direct appeal, defendant raised five issues. First, defendant claimed that the trial court failed to assess the potential risk of a conflict and to properly inquire into defendant's *pro se* allegations of ineffective assistance of counsel. Second, defendant argued that the trial court acted as an advocate for the State in requesting details of injuries suffered in connection with defendant's past offenses, then relied on the graphic account supplied in fashioning defendant's sentences. Third, defendant maintained that he was not properly admonished pursuant to Illinois Supreme Court Rule 605(a). Fourth, defendant argued that the trial court should have sentenced defendant on only one count of aggravated kidnapping, because the second count of aggravated kidnapping was predicated on the same physical act, and the crime of aggravated unlawful restraint is a lesser-included offense. Finally, defendant argued that his seven-year sentence exceeded the statutory maximum penalty for aggravated unlawful restraint. As noted,

10

this court vacated defendant's conviction for aggravated unlawful restraint on one-act, one-crime principles but otherwise affirmed. See *Young*, No. 1-04-2540.

¶ 26    In February 2009, defendant filed his first postconviction petition pursuant to the Act. Defendant's *pro se* petition alleged (i) that his appellate counsel was ineffective for failing to challenge the sufficiency of the evidence on direct appeal, (ii) hearsay and confrontation violations regarding Fulwiley's statements to Johnson, (iii) ineffective assistance of trial counsel for failing to investigate an alibi, and (iv) that trial counsel denied him the right to a jury trial by advising him to take a bench trial. The trial court summarily dismissed the petition. On appeal from that dismissal, defendant argued only that his trial counsel denied him the right to jury trial by suggesting that he proceed with a bench trial. As noted, this Court affirmed. *Young*, No. 1-09-1085.

¶ 27                              III. Instant Successive Petition

¶ 28    On January 22, 2014, defendant sought leave to file the successive postconviction petition that is the subject of the instant appeal. His successive petition presented, among other things, a claim of actual innocence based on the theory that no kidnapping ever occurred, and instead Bragg falsely accused defendant and his codefendants of kidnapping him in order to clear a debt Bragg owed to Stokes. Defendant supported his claim of actual innocence with postconviction affidavits from himself, Williams, Stokes, Fulwiley, Johnson, and two additional alleged witnesses, Latessia Stewart and LaKeesha Perkins.[1]

---

[1]Because defendant does not argue on appeal that the affidavits of Williams, Stokes, Fulwiley, or Johnson constitute newly discovered evidence, we do not detail the contents of their affidavits in this Opinion.

11

¶ 29    Stewart averred that on April 11, 2002, she went to visit a friend on South Morgan Street in Chicago around 8:30 p.m. While there, she encountered a person she knew as "Sed"[2] and two other men walking down the stairs of her friend's apartment building as she walked up the stairs. Stewart knew Sed because they previously lived in the same neighborhood, so he stopped to talk with her, and they exchanged phone numbers. One of the men with Sed, who Stewart described as a dark-skinned man, was trying to rush Sed away by saying, "let's go make this money." Sed hugged Stewart goodbye and entered a black vehicle. The dark-skinned man sat in the driver's seat, while Sed sat in the passenger seat. The third man sat in the back seat, and Stewart observed the group drive away. Stewart then knocked on her friend's front door, but her friend did not answer, so Stewart went home. The following day, Stewart returned to the building because she was concerned that she had not heard from her friend. As Stewart exited her vehicle, a police officer stopped her and asked whether she lived in the building. She told the officer that she did not, but that she had been at the building the prior evening. She told the officer what she had observed, and the officer wrote down what Stewart told him. Stewart also provided the officer with her name and address on a piece of paper which she signed. Stewart averred that she came forward with this statement in 2011 after noticing fliers posted on South Morgan Street requesting information from anyone that was in that area on April 11, 2002. Stewart averred that although she was initially unsure of the exact date of her encounter with Sed and the two other men, after reading the flier she searched for defendant's name on the internet and determined he was not one of the three men she observed on South Morgan Street on April 11, 2002.

---

[2]We accept defendant's assertion that "Sed" refers to codefendant Sedgwick Williams.

¶ 30        Perkins averred that a few weeks prior to the alleged kidnapping, Fulwiley hired her to work security at his house in Harvey, from where he sold drugs. While working at the house on April 11, 2002, around 9:30 or 10:00 p.m., she observed a black Lincoln Town Car arrive at the house and observed a person who she knew as "Dale"[3] exit the driver's seat and Fulwiley exit the passenger seat. Dale and Fulwiley entered the house. Around 11:30 p.m., she observed a red vehicle park outside and observed a person she knew as "Sed" exit the vehicle and enter the house. "Sed" left around midnight. Perkins averred that the only other people who approached the house that night were people she recognized. She was at the house from 6:00 p.m. on April 11 until 2:00 a.m. on April 12, 2002, and did not observe defendant there. The next morning, Perkins returned to the house to collect her paycheck from Fulwiley. Dale opened the door for Perkins, then went inside the house, and came out with Fulwiley and Sed. Perkins talked with Fulwiley while Dale started the black Lincoln Town Car and Sed entered his own vehicle. Fulwiley paid Perkins half of what he owed her, entered Dale's vehicle, and the three men drove away. Perkins averred that defendant was not present at this time. When Perkins went back to Fulwiley's house that evening to collect the remainder of her pay, police officers were there. She spoke with an officer and told him about her interaction with the three men that morning. The officer took notes of their conversation and also had Perkins provide her name and address on a piece of paper, which Perkins signed. Perkins averred that she came forward with this statement in 2011 after noticing fliers posted in Harvey requesting information about an incident that occurred there between April 11 and April 12, 2002.

---

[3]We accept defendant's assertion that "Dale" refers to complaining witness Dale Bragg.

13

¶ 31    In defendant's affidavit, he averred that his brother had posted the fliers noticed by Stewart and Perkins at his direction, and that Stewart's and Perkins' existence was not known by or disclosed to defendant or his counsel until they came forward in 2011.

¶ 32    In addition to actual innocence, defendant's January 22, 2014, successive petition also alleged ineffective assistance of appellate and postconviction counsel. As noted, in defendant's initial *pro se* petition, which was summarily dismissed, he alleged that his appellate counsel on direct appeal was ineffective for failing to challenge the sufficiency of the evidence. In defendant's affidavit, he averred that he instructed his appellate postconviction counsel to preserve this issue on appeal, but his appellate postconviction counsel responded that she would not allege ineffective assistance against defendant's direct appeal counsel because they were friends. Defendant did not terminate the representation at that time but averred that it was his understanding that his appellate postconviction counsel would be raising an ineffective assistance of direct appeal counsel as he instructed. According to defendant, he did not learn that his appellate postconviction counsel failed to preserve this claim until after the appellate brief was filed on his behalf.

¶ 33    The trial court granted defendant's motion for leave to file and advanced his successive petition to the second stage of postconviction proceedings. The State then filed a motion to dismiss, which the trial court granted after hearing argument on April 28, 2021. In granting the State's motion, the trial court reasoned that the affidavits submitted in support of actual innocence were "not particularly persuasive and cumulative," and that he would not find "appellate counsel was ineffective for not raising a particular claim as stated."

¶ 34    On May 4, 2021, defendant filed a timely notice of appeal.

¶ 35                                            ANALYSIS

¶ 36        On appeal, defendant raises two claims of error. First, defendant argues that the trial court erred by dismissing his claim of actual innocence without an evidentiary hearing where he made a substantial showing that his claim of actual innocence was supported by the newly discovered affidavits of Stewart and Perkins. Second, defendant argues that the trial court erred by dismissing his ineffective assistance of appellate counsel claim where he made a substantial showing that his appellate counsel was ineffective for failing to challenge the sufficiency of the evidence on direct appeal, and postconviction appellate counsel was likewise ineffective for refusing to preserve the issue due to her friendship with direct appeal counsel. The State responds that defendant has failed to make a substantial showing of actual innocence and further maintains that his ineffective assistance of counsel claim is barred by the doctrines of *res judicata* and forfeiture and is otherwise without merit. For the reasons that follow, we affirm the decision of the trial court.

¶ 37                            I. The Post-Conviction Hearing Act

¶ 38        As noted, defendant's successive petition was dismissed at the second stage of postconviction proceedings. We therefore begin with a summary of the familiar procedural framework of the Act. The Act provides a three-stage process by which defendants may collaterally challenge their convictions for violations of federal or state constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2018); *People v. LaPointe*, 227 Ill. 2d 39, 43 (2007). To be entitled to postconviction relief, a defendant must show that he or she has suffered a substantial deprivation of his or her federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged. 725 ILCS 5/122-1(a) (West 2018); *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006) (citing *People v. Whitfield*, 217 Ill. 2d 177, 183 (2005)).

15

¶ 39    Although our supreme court has made clear that the Act contemplates only one postconviction proceeding, "[n]evertheless, [our supreme] court has, in its case law, provided two bases upon which the bar against successive proceedings will be relaxed." *People v. Edwards*, 2012 IL 111711, ¶ 22. Those two bases are (1) cause and prejudice for failing to raise the claim in an earlier proceeding and (2) actual innocence. *Edwards*, 2012 IL 111711, ¶¶ 22-23. Prior to commencing a successive proceeding, a defendant must obtain leave of court to file his or her petition. *People v. Robinson*, 2020 IL 123849, ¶ 43. If leave to file is granted, the petition is docketed for second-stage proceedings. *People v. Sanders*, 2016 IL 118123, ¶ 28. In the case at bar, the trial court granted defendant's motion for leave to file a successive petition and advanced the petition to the second stage.

¶ 40    At the second stage, the State may file either a motion to dismiss or an answer to the petition. 725 ILCS 5/122-5 (West 2018); *People v. Domagala*, 2013 IL 113688, ¶ 33. "Where the State seeks dismissal of a post-conviction petition instead of filing an answer, its motion to dismiss assumes the truth of the allegations to which it is directed and questions only their legal sufficiency." *People v. Miller*, 203 Ill. 2d 433, 437 (2002). The trial court must then determine "whether the petition and any accompanying documentation make a substantial showing of a constitutional violation." *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). If the defendant makes such a showing, the petition is advanced to a third-stage evidentiary hearing. *Domagala*, 2013 IL 113688, ¶ 34; *People v. Allen*, 2015 IL 113135, ¶ 22. At a third-stage evidentiary hearing, the trial court acts as fact finder, determines witness credibility and the weight to be given particular testimony and evidence, and resolves any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

16

¶ 41    A second-stage dismissal of a defendant's petition presents a legal question we review *de novo*. *Whitfield*, 217 Ill. 2d 177 (2005); *People v. Dupree*, 2018 IL 122307, ¶ 29 (review of a second-stage dismissal is *de novo*). *De novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *People v. Van Dyke*, 2020 IL App (1st) 191384, ¶ 41. Since this stage involves purely a legal determination, "[t]he inquiry [at the second stage] does not require the trial court to engage in any fact-finding or credibility determinations." *Dupree*, 2018 IL 122307, ¶ 29. "Unless the petitioner's allegations are affirmatively refuted by the record, they are taken as true, and the question is whether those allegations establish or 'show' a constitutional violation." *Domagala*, 2013 IL 113688, ¶ 35.

¶ 42                                          B. Actual Innocence

¶ 43    The due process clause of the Illinois Constitution affords postconviction petitioners the right to assert a claim of actual innocence based on newly discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009). For an actual innocence claim to survive second-stage dismissal, the evidence in support of the claim must be newly discovered, material and not merely cumulative, and of a conclusive character. *Ortiz*, 235 Ill. 2d at 333; *People v. Coleman*, 2013 IL 113307, ¶ 96. Newly discovered means that the evidence was not available at trial and could not have been discovered earlier through the exercise of due diligence. *People v. Burrows*, 172 Ill. 2d 169, 180, (1996). Material means that the evidence is relevant and probative of the defendant's innocence. *Coleman*, 2013 IL 113307, ¶ 96. Noncumulative means that the evidence adds to what the trier of fact heard. *Coleman*, 2013 IL 113307, ¶ 96. Finally, evidence is of a conclusive character where, when considered along with the trial evidence, it would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96. "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Robinson*,

17

2020 IL 123849, ¶ 47. "Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 48.

¶ 44 Assuming, without deciding, that Stewart's and Perkins' affidavits may be considered new and noncumulative, we remain unpersuaded that they are sufficiently conclusive to make a substantial showing of defendant's actual innocence. Defendant argues that accepting Stewart's affidavit as true requires accepting that Bragg was never taken at gunpoint from outside Stokes' home on South Morgan, and further argues that accepting Perkins' affidavit as true requires accepting that defendant was never present at the house in Harvey. Defendant maintains that this evidence is conclusive because, especially when considered alongside the State's weak trial evidence, it casts the State's evidence in such a different light that it would probably lead to a different result. However, defendant overstates the exculpatory value of each affidavit.

¶ 45 First, Stewart's affidavit does not actually identify the man who stated "let's go make this money" as complaining witness Bragg, but rather describes the person who made the statement as a dark-skinned man who Stewart did not know. In addition, the State did not present any evidence that defendant was present when Bragg was allegedly kidnapped at gunpoint on South Morgan Street, so Stewart's statement that she did not observe him at that scene does not contradict the State's evidence in that regard. Moreover, even assuming that Stewart would testify that the dark-skinned man Stewart observed was Bragg, the fact that Bragg did not appear to be held against his will at that time is not "so conclusive that it is more likely than not that no reasonable [trier of fact] would find [defendant] guilty beyond a reasonable doubt," of an ongoing offense took place across multiple locations. *Sanders*, 2016 IL 118123, ¶ 47.

18

Instead, such evidence, at best, "merely conflicts" with certain aspects of the State's case. *People v. Mabrey*, 2016 IL App (1st) 141359, ¶ 30 (evidence that "merely conflict[s]" with evidence at trial is insufficiently conclusive to support actual innocence claim).

¶ 46 Second, while Perkins averred that she did not observe defendant come or go from the house in Harvey while she was working, her affidavit makes clear that she was not present for many hours during the alleged offense and never entered the house in which Bragg was allegedly held. Thus, her statement that defendant was "never present" there on the date of the alleged kidnapping is a mere conclusion that need not be accepted as true. *People v. Rissley*, 206 Ill. 2d 403, 412 (2003) ("[N]onfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a[n] [evidentiary] hearing under the Act."). Moreover, we are not persuaded that Perkins' description of Bragg's demeanor is conclusive of defendant's claim that no kidnapping occurred. The State's evidence at trial established that the codefendants granted Bragg certain liberties during his kidnapping and also that Bragg attempted to outsmart the codefendants by arranging a fake drug transaction. Thus, Perkins' statement that she observed Bragg enter the house voluntarily on April 11, 2002, and open the door to the house voluntarily on April 12, 2002 would not "place the trial evidence in a different light" sufficient to "undermine[ ] the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 48.

¶ 47 When considered alongside Bragg's testimony of the kidnapping, which was corroborated by Johnson's statement and the fake money and guns recovered during the codefendants' arrests, Stewart's and Perkins' proposed testimony is not "of such a conclusive character that" it "would probably lead to a different result" on retrial. *Robinson*, 2020 IL 123849, ¶ 83.

19

Accordingly, defendant has failed to make a substantial showing of actual innocence sufficient to advance his petition to a third-stage evidentiary hearing.

¶ 48                                      III. Ineffective Assistance of Appellate Counsel

¶ 49    Defendant next argues that he has made a substantial showing that his appellate counsel was ineffective for failing to challenge the sufficiency of the evidence on direct appeal. The State responds that defendant's claim is barred by *res judicata* and fails on the merits even if not procedurally barred.

¶ 50    Both the United States Constitution and the Illinois Constitution guarantee criminal defendants the right to the effective assistance of counsel. *People v. Hale*, 2013 IL 113140, ¶ 15 (citing U.S. Const., amends. VI, XIV, and Ill. Const. 1970, art. I, § 8). This right includes the effective assistance of counsel on appeal, such that issues not raised on direct appeal due to counsel's incompetence are not deemed forfeited for postconviction review. *People v. Blair*, 215 Ill. 2d 427, 443-44, 450-51 (2005).

¶ 51    To determine whether a defendant was denied his or her right to effective assistance of appellate counsel, a reviewing court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)). Under *Strickland*, a defendant must prove both (1) that his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness (*i.e.* counsel's performance was deficient) and (2) that absent these errors, there was a reasonable probability that the appeal would have resulted in relief for the defendant (*i.e.*, counsel's deficient performance was prejudicial). *People v. Moore*, 177 Ill. 2d 427, 428 (1997); see also *People v. Cathey*, 2012 IL 111746, ¶ 31.

20

¶ 52    Defendant argues that his appellate counsel's failure to challenge the sufficiency of the evidence on direct appeal fell below an objective standard of reasonableness where Bragg's incredible and self-serving testimony, which was insufficient to convict his codefendants, was corroborated at defendant's separate trial only by Johnson's recanted and inconsistent statement, and where the trial court made statements on the record indicating that Bragg lacked credibility. Defendant further argues that in light of the weakness of the State's case, there was a substantial likelihood that defendant's conviction may have been reversed if his appellate counsel had raised an insufficiency of the evidence claim on direct appeal.

¶ 53    Defendant concedes, however, that he previously brought this claim in his initial *pro se* postconviction petition, which was summarily dismissed, and defendant did not raise the issue on appeal from that dismissal. The State maintains that the claim is accordingly barred by the doctrine of *res judicata* and/or forfeited. In a postconviction proceeding, the common law doctrines of *res judicata* and forfeiture operate to bar the raising of claims that were or could have been adjudicated in a prior proceeding. *Blair*, 215 Ill. 2d at 443. The doctrine of *res judicata* bars the consideration of issues that were previously raised and decided in a prior proceeding. *Blair*, 215 Ill. 2d at 443. The doctrine of forfeiture bars claims that could have been raised in a prior proceeding but were not. *Blair*, 215 Ill. 2d at 443-44. Exceptions to these doctrines may allow otherwise-barred claims to proceed where fundamental fairness so requires, where the alleged forfeiture stems from the incompetence of appellate counsel, or where the facts relating to the claim do not appear on the face of the original appellate record. *Blair*, 215 Ill. 2d at 450-51.

¶ 54    Defendant argues that neither *res judicata* nor forfeiture should bar the adjudication of his claim on the merits because the alleged forfeiture stems from the incompetence of his

21

postconviction appellate counsel. In other words, he argues that the second exception applies. We thus turn to the question of whether defendant has made a substantial showing that his postconviction appellate counsel provided statutorily ineffective assistance. "Because the right to counsel in postconviction proceedings is derived from statute rather than the Federal or State Constitutions, postconviction petitioners are guaranteed only the level of assistance provided for by the Act. That assistance has been defined by this [supreme] court to mean a 'reasonable' level of assistance." *People v. Flores*, 153 Ill. 2d 264, 276 (1992). While our supreme court has not set forth a specific test for determining whether postconviction counsel has provided the "reasonable level of assistance," required by the Act, it has explained that the standard is "significantly lower than the one mandated at trial by our state and federal constitutions." *People v. Custer*, 2019 IL 123339, ¶ 30. Accordingly, this court has at times applied a "*Strickland*-like" analysis for evaluating postconviction counsel's performance, while indulging a strong presumption that postconviction counsel performed reasonably. *People v. Zareski*, 2017 IL App (1st) 150836, ¶¶ 58-59.

¶ 55 Against this backdrop, defendant argues that his postconviction appellate counsel operated under an actual conflict of interest, which in turn rendered her assistance statutorily ineffective. Defendant is correct that, despite the more relaxed standards governing ineffective assistance of postconviction counsel claims, our supreme court has expressly held that "[t]he right to reasonable assistance of postconviction counsel includes the correlative right to conflict-free representation." *People v. Hardin*, 217 Ill. 2d 289, 300 (2005). Therefore, we apply the same actual conflict analysis to claims of postconviction counsel conflicts as elsewhere. That is, in order to obtain relief based on a claim that counsel's actual conflict of interest rendered them ineffective, a defendant must point to "some specific defect in his counsel's strategy, tactics,

22

or decision making attributable to a conflict" having an "adverse effect" on his counsel's performance. (Internal quotation marks omitted.) *Zareski*, 2017 IL App (1st) 150836, ¶ 38.

¶ 56 Applying these standards to the case at bar, defendant argues that his postconviction appellate counsel's refusal to raise the issue of his direct appeal counsel's ineffectiveness was attributable to an actual conflict, because postconviction appellate counsel and direct appeal counsel were "friends," and postconviction appellate counsel told defendant she would not raise the issue of her own friend's ineffectiveness. However, even accepting the allegations concerning counsels' relationship as true, we must still determine whether postconviction appellate counsel's refusal to argue direct appeal counsel's ineffectiveness based on their friendship constituted a "specific defect" in postconviction appellate counsel's strategy, tactics, or decision-making. See *People v. Taylor*, 237 Ill. 2d 356, 380 (2010). In other words, we must examine whether the claim that was not pursued "would have been successful." *Zareski*, 2017 IL App (1st) 150836, ¶ 42. While this analysis inevitably returns us to the merits of defendant's ineffective assistance of appellate counsel claim, we conclude that it would not have been successful and would not have reasonably changed the result.

¶ 57 As noted, the *Strickland* standard applies equally to ineffective assistance claims concerning trial and appellate counsel. *People v. Petrenko*, 237 Ill. 2d at 490, 497 (2010). To prevail on an ineffective assistance of appellate counsel claim, a defendant must therefore satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). "That is, if an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003).

23

¶ 58    In the case at bar, defendant suffered no prejudice from his appellate counsel's purported failure to challenge the sufficiency of the evidence on direct appeal because well-settled law dictates that the evidence adduced at defendant's trial was legally sufficient to convict him. See *People v. Easley*, 192 Ill. 2d 307, 329 (2000) ("unless the underlying issues are meritorious, defendant has suffered no prejudice from counsel's failure to raise them on appeal"). When reviewing a sufficiency claim, the question for the reviewing court is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). Defendant's characterization of the trial evidence on appeal thus misapprehends the sufficiency of the evidence standard by drawing all inferences in favor of the defendant.

¶ 59    In addition, it is well-settled that "[a] positive identification by a single eyewitness who had ample opportunity to observe is sufficient to support a conviction." *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007). Here, the trial court found Bragg's eyewitness testimony did not stand alone but was corroborated by Johnson's statement to law enforcement and the fake money and weapons recovered at the codefendant's arrests. Indeed, "Defendant's argument regarding the sufficiency of the evidence fails because the weaknesses in the evidence that defendant cites on appeal were all presented to, considered, and rejected by the trial judge." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 63; *People v. Slim*, 127 Ill. 2d 302, 307 (1989) ("In a bench trial it is for the trial judge to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence."). Accordingly, defendant has not made a substantial showing either that his direct appeal counsel was ineffective for failing to challenge the sufficiency of the evidence on direct

24

appeal or that any alleged conflict on the part of his postconviction appellate counsel deprived him of the reasonable assistance of postconviction counsel guaranteed by the Act.

¶ 60                                            CONCLUSION

¶ 61          For the reasons stated, we affirm the decision of the trial court.

¶ 62          Affirmed.

*People v. Young*, 2022 IL App (1st) 210534

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 02-CR-11395(03); the Hon. James B. Linn, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and David T. Harris, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, David H. Iskowich, and Retha Stotts, Assistant State's Attorneys, of counsel), for the People. |