NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220563-U

NO. 4-22-0563

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 10, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|       v. | ) | Peoria County |
| NATHAN A. LEUTHOLD, | ) | No. 13CF208 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Kevin W. Lyons, |
| | ) | Judge Presiding. |

---

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1  *Held*: (1) Even if it was objectively unreasonable of defense counsel to forgo an opportunity for impeachment, the error is considered ineffective assistance of counsel *only* if the error, singly or in combination with other errors, destroys confidence in the guilty verdict.

(2) If a defendant takes a direct appeal, any claim of ineffective assistance that the defendant could have raised, but did not raise, in the direct appeal will be regarded, in a subsequent postconviction proceeding, as having been procedurally forfeited.

(3) Insomuch as a demonstrative exhibit would have merely summarized, in a different form, evidence the jury had heard in the trial, failing to present the exhibit was not ineffective assistance of counsel, for the exhibit would have created no reasonable probability of an acquittal.

(4) Because a claim of ineffective assistance cannot be based on speculation, a postconviction petition that accuses defense counsel of rendering ineffective assistance by failing to call a witness must supply an affidavit by the witness or other evidence summarizing the testimony the witness would have given.

(5) To establish that defense counsel rendered ineffective assistance by inadequately cross-examining a witness, a defendant must (a) specify the additional

questions that defense counsel should have asked the witness and (b) prove what answers, beneficial to the defense, the witness would have given.

(6) To establish that defense counsel rendered ineffective assistance by failing to perform an investigation, the defendant must show what the investigation would have revealed.

(7) Defense counsel cannot be found to be ineffective for neglecting to make an adequate offer of proof if the record fails to show what an adequate offer of proof would have been.

¶ 2 Defendant, Nathan A. Leuthold, is serving a sentence of 80 years' imprisonment for the first degree murder of his wife, Denise Leuthold (the victim). See 720 ILCS 5/9-1(a)(1) (West 2012). After an unsuccessful direct appeal (see *People v. Leuthold*, 2016 IL App (3d) 140720-U), he petitioned the circuit court of Peoria County for postconviction relief. The court granted the State's motion to dismiss the amended petition as legally insufficient. Defendant appeals. We conclude, in our *de novo* review, that the petition fails to make a substantial showing of a constitutional violation. Therefore, we affirm the judgment. Because our disposition does not include a remand, we need not consider defendant's request, pursuant to Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), that we order the assignment of this case to a different judge.

¶ 3                                    I. BACKGROUND

¶ 4                        A. The Report of an Apparent Burglary

¶ 5 Defendant and the victim were missionaries. Except when they were away doing missionary work, they and their three children lived with the victim's parents, Doug Newton and Diane Newton, at 700 West Mossville Road in Peoria, Illinois.

¶ 6 On February 14, 2013, at 3:11 p.m., while the Newtons were away at work, defendant telephoned 911 and reported an apparent burglary at the Newton house. He told the dispatcher that, upon coming home, he had found the garage door open and broken glass in the doorway and that he had refrained from going inside.

¶ 7        When the Peoria police entered the house, they found the victim lying face down in a pool of blood, in the hallway near the front door. She was dead from a gunshot wound to the back left side of her head. She still had her coat and gloves on, and her coat was still fully buttoned up, although one of her arms was pulled out of its coat sleeve. A bifold closet door near her body was knocked partly off its pins. A spent .40-caliber cartridge case and a live .40-caliber cartridge were on the floor, next to her head. The fired projectile had passed completely through her skull and was entangled in her hair, near the exit wound. A key to her Ford Focus automobile was underneath her body, but the Ford Focus was gone.

¶ 8        Dustin Johnson, a forensic scientist with the Illinois State Police–who, the parties stipulated, was "an expert in the field of firearms and tool markings"—opined, to a reasonable degree of scientific certainty, "that that bullet and that [cartridge case] were fired by a Glock firearm."

¶ 9                                    B. Other Evidence

¶ 10        On February 14, 2013, after arriving at the crime scene, Peoria Police Officer Timothy Wong drove to Robinson Park, which was "just down the street." He found the victim's Ford Focus parked in "the parking lot area of the park." Less than 50 feet away from the Ford Focus, on a picnic table, was a pair of bloody gloves. Wong glanced in a nearby trash can and saw nothing in it but garbage.

¶ 11        The next morning, Peoria Police Officer Brendan Westart went to Robinson Park to perform a search with a dog. In the garbage can, Westart found a car key, and it fit the victim's Ford Focus.

¶ 12    DNA on the gearshift of the Ford Focus contained two profiles: a female profile, which matched that of the victim, and a partial male profile. Defendant could not be excluded from the partial male profile.

¶ 13    C. The Search of the Newton House Pursuant to Signed Consents

¶ 14    Detective Jason Leigh obtained a signed consent from Diane Newton to search the areas of the house used by her and her husband. Also, Leigh obtained a signed consent from defendant to search the areas of the house that had been used by defendant, the victim, and their children.

¶ 15    Peoria Police Officer Richard Linthicum helped with the search. Having investigated approximately 100 burglaries up to that point in his career as a police officer, Linthicum began to wonder whether there really had been a burglary at the Newton house. For two reasons, he suspected the burglary had been staged. First, the kitchen had been gone through, and burglars typically did not bother with the kitchen. Second, drawers had been pulled out of cabinets and placed on the floor instead of having their contents dumped out.

¶ 16    A jewelry box in the master bedroom appeared to have been opened. The jewelry box had a fingerprint on it that was not the fingerprint of anyone who lived in the house.

¶ 17    In defendant and the victim's bedroom, clothes from the closet were strewn on the floor. An ammunition box had been dumped out. On the floor in the front of the closet was a black hooded sweatshirt, which, it was later determined, had gunshot residue on its right cuff and defendant's DNA on its inside collar. A combination lockbox containing defendant's .40-caliber Glock pistol was missing from the closet and from the house. In a zippered day planner, the police found a note, which, according to Diane Newton, was in the victim's handwriting. The note read:

"What on earth could you possibly be thinking. I can't imagine anything you could tell me that would hurt worse than what you are doing to me now—every day. *** I've never been good enough, never done enough. I know that you want me dead. I am not stupid. *** You want to humiliate me by running around with a 20 year old? Fine. *** If I haven't pleased you in seventeen years, nothing I do now will please you. And I refuse to leave my children just because you have decided to do this to me. You are the *only* person who thinks that I am a bad mother. *** How long are you going to do this to me? Oh, yeah—until I break. That's what you said isn't it? Well, happy waiting." (Emphasis in original.)

¶ 18            D. Internet Searches Recovered from Defendant's Laptop

¶ 19            To show the jury that defendant had been forthright and cooperative, defense counsel elicited testimony from Detective Leigh that defendant had willingly delivered a laptop to Leigh so that the laptop could be searched. As it turned out, the laptop had no internet history. The browser had been set up to delete the browsing history upon exit. Nevertheless, deleted information was recoverable as long as it had not yet been overwritten on the hard drive. Therefore, a digital forensic expert, Detective William Lynn, was able to recover some internet searches that had been performed on the computer. The decision on direct appeal listed some of the searches:

" 'Blow to the head,' 'Hitting someone over the head to knock them out,' 'How easy is it to electrocute oneself,' 'How to electrocute,' 'How to erase everything from iPad,' 'How to erase everything from iPad II,' 'How to erase HTC Incredible [(a smartphone)],' 'How to hide the sound of a gunshot,' 'How to make GHB [(a date rape drug)] without distillation,' 'How to muffle a gunshot,' 'How to silence a Glock 40,' 'How to suppress a Glock 40,' 'How to suppress the sound of

- 5 -

a gunshot,' 'Lethal Injection,' 'Murder Insulin,' 'Nitrogen P3,' 'Nondiabetic getting insulin shot,' 'Nondiabetic getting insulin SHO,' 'Sleep inducing drugs,' 'Sleep inducing knockout,' 'Suicide by injecting air,' 'Suicide insulin,' 'Suicide methods,' 'Visine knockout,' 'What fumes if inhaled can make you pass out,' 'Where to buy potassium chloride,' 'Where to buy pure potassium chloride in stores,' 'Herbal knockout drops,' *** 'Lethal injection,' *** 'Sleep inducing knockout,' 'Where to buy pure potassium chloride,' 'How to kill yourself with insulin,' 'Bathtub electrocution,' 'Does insulin work for suicide,' 'How to best shoot yourself,' *** 'How to cause sleep paralysis,' and 'Short-term furnished apartments, Pensacola, FL.' " *Leuthold*, 2016 IL App (3d) 140720-U, ¶ 84 .

¶ 20 Although, in his brief in the present appeal, defendant refers to the laptop as "[Defendant] and [the victim's] computer," Lynn testified that (1) the only user account on the laptop was in defendant's name, (2) the laptop was registered to defendant, (3) documents and emails connected the laptop to defendant, and (4) Lynn had found no indication that anyone other than defendant had ever used the laptop. See *id.* ¶ 84.

¶ 21 E. The Relationship Between Defendant and Aina Dobilaite

¶ 22 Aina Dobilaite was a young woman whom the Leutholds met at a church in Lithuania when she was six years old. When Dobilaite finished high school in Lithuania, the Leutholds sponsored her to come to the United States so that she could attend a Christian college in Pensacola, Florida. In 2011, Dobilaite's visits with defendant in a Pensacola hotel prompted the college to review Dobilaite's "scholastic eligibility." As a result of this review, Dobilaite left the college. In the summers of 2011 and 2012, defendant and Dobilaite went to Europe together. In 2012, she visited him in an apartment he rented in Chicago. They had a joint account at Citizens

Equity First Credit Union (CEFCU). He bought her an Eddie Bauer jacket. She frequently accompanied him to Five Senses Spa in Peoria and to a gym.

¶ 23        On November 3, 2012, defendant e-mailed Dobilaite in Lithuanian, "I love you," "Because of the dreams that we have together," and "Because you are my world and my everything." She replied, "Thank you," followed by a smiley face.

¶ 24        On February 13, 2013, at 12:19 p.m., Dobilaite texted defendant that she was going to the gym. He texted back, "Without me! ☺." At 1:24 p.m., Dobilaite texted him that she was "done with gym." He texted back, "☺ Wet?" She responded, "A little bit ☺." He then texted her, "But you smell good ☺" and then, "And you are also beautiful ☺." These messages had been deleted from both their phones (but, again, the digital information was nevertheless recoverable).

¶ 25        At 8:37 a.m. on Valentine's Day, February 14, 2013, defendant texted Dobilaite, "I know there is a lot to do today. I pray that there is enough time to do everything. Have good lectures and meeting. ☺ Take care of yourself." At 8:39 a.m., Dobilaite texted back "☺." Both of these messages were deleted from her phone.

¶ 26        At 3 p.m. on February 14, 2013, defendant sent Dobilaite a text message that the police believed a burglary or robbery had taken place at the Newton house. Dobilaite texted back, "Interesting," followed by a smiley-face emoticon. In her testimony in the jury trial, Dobilaite claimed that the Lithuanian word she had used, *įdomus*, could also mean "weird" or "bizarre." In the record, however, the word is translated as "interesting."

¶ 27        In April 2013, $2500 of the funds in defendant's CEFCU account, an account designated "for the benefit of" his three children, were paid to Dobilaite's attorney.

¶ 28                F. Reverend Sexton's Warning to Defendant

¶ 29          Reverend David Sexton testified he was the pastor of LaMarsh Baptist Church in Mapleton, Illinois, and that defendant and the victim were members of the church. About eight months before the murder, Sexton had a talk with defendant and the victim because Sexton had seen defendant "riding around with Aina in a car without anybody else." Sexton counseled defendant that his behavior with Dobilaite looked bad and that it was detrimental to his ministry as a missionary. Sexton warned him that if this unseemly behavior continued, the church would end its financial support of defendant's missionary work. According to Reverend Kenneth Linder, defendant had been receiving $2500 every other week from various churches throughout the country.

¶ 30                         G. Surveillance Videos

¶ 31          Peoria Detective James C. Feehan Jr. testified that, through security surveillance videos, the police were able to determine defendant's locations at various times on February 14, 2013. Defendant was at Chase Bank, 124 Southwest Adams Street in Peoria, at 9:20 a.m. He was at the same Chase Bank again at 10:20 a.m. At 10:41 a.m., he bought gas at Huck's gas station, 1415 Alta Road. From 11 a.m. through 11:31 a.m., he was at the Starbucks on Knoxville Avenue and Pioneer Parkway. From 12:45 p.m. until 12:50 p.m., he was at the same Starbucks again. At 1 p.m., he was at Brush Auto, 2918 Alta Road. The owner of Brush Auto, Carl Brush, testified that defendant had what "looked like a day['s] growth" of whiskers on his face—a "little scruffy." From 1:15 p.m. until 1:18 p.m., defendant was at the Five Senses Spa in Grand Prairie Mall. From 1:22 p.m. until 1:43 p.m., he was at the Starbucks in the same mall. From 2:25 p.m. until 2:33 p.m., he was at Red Carpet Car Wash, getting his car washed.

¶ 32          As the appellate court noted on direct appeal, "By all accounts, defendant's whereabouts were unaccounted for from about 11:31 a.m.[,] when he left the Starbucks located at

Knoxville Avenue and Pioneer Parkway[,] until 12:45 p.m.[,] when he returned to the same Starbucks." *Id.* ¶ 114.

¶ 33 Detective Leigh testified that he and Detective Moore drove from Robinson Park to the Starbucks on Knoxville Avenue and back. The driving time between Robinson Park and the Starbucks averaged about seven minutes, one way.

¶ 34 H. The Victim Takes Janelle to Kindergarten

¶ 35 The Leutholds' youngest child, Janelle, attended afternoon kindergarten at the Northminster Learning Center, on Mossville Road, just down the road from the Newton house. At about 12:15 p.m. on February 14, 2013, a teacher at the kindergarten, Michelle Lunquist, saw the victim dropping off Janelle. Lundquist testified that, after making sure that Janelle was settled in, the victim left Northminster Learning Center between 12:20 p.m. and 12:25 p.m.

¶ 36 I. The Sighting of a Pedestrian on Mossville Road

¶ 37 Diane Parrish and her husband, Robert Parrish, lived at 607 West Mossville Road. On February 14, 2013, they decided to go to a restaurant and have a Valentine's Day lunch together. Robert Parrish drove, and Diane Parrish sat in the front passenger seat. They pulled out of their driveway and headed toward Robinson Park when they saw a man walking on the side of the road. He was walking away from Robinson Park and in the direction of 700 West Mossville Road. Although it was quite cold out, the man was wearing only a black hooded pullover sweater, with the hood pulled up over his head. Diane Parrish had Robert Parrish slow down so that she could get a good look at the man. Because the man had his hood up and was looking down, Diane Parrish could see only his cheekbone and jaw. He was white, according to Diane Parrish's testimony, and he had a growth of stubble on his face—he was "scruffy." Diane Parrish testified that two cars were parked in the parking lot of Robinson Park as they drove by. When they arrived

at the restaurant, no tables were available, so the Parrishes decided to eat at home. On their return trip through Robinson Park, Diane Parrish noticed that the "[t]he one little silver car, compact car, was gone."

¶ 38    In the evening of February 14, 2013, having heard of a murder across the street, Diane Parrish telephoned the police, and a police officer came over and spoke with her and her husband. Diane Parrish testified:

> "I believe the police asked my husband if he could identify the person walking along the side of the road, and he said, 'No,' but he had already been sitting with me when I identified him, and they said, 'Why not?' He said, because he was driving. He didn't get good look at him, and he thought he was black.
>
> Q. Your husband thought the individual was black?
>
> A. Correct.
>
> Q. And did you correct that with the police?
>
> A. I did. I never said he was black."

¶ 39    Two days later, Diane Parrish identified defendant out of a photographic array. She also identified him, in the jury trial, as the man she had seen walking on the side of Mossville Road.

¶ 40                         J. What Time the Gunshot Was Heard

¶ 41    Becky Skehan-Passie testified that she lived at 610 West Mossville Road and that on February 14, 2013, around noon, she was trying to put her child to sleep by driving him around the neighborhood. Her sister lived on Mossville Road, about a house-width away from 700 West Mossville Road—her sister's house was separated from 700 West Morrisonville Road by Stoneybroke Lane. At about 12:30 p.m., Skehan-Passie pulled into her sister's driveway, to drop

off some food along with some things to alleviate her sister's morning sickness. Skehan-Passie got out of her car. She did not go into her sister's house immediately. Rather, she stood in the driveway for a few minutes, taking photographs of her own house from the vantage of her sister's house. As she was standing in the driveway before entering her sister's house, she heard a gunshot. She could not pinpoint the exact time when she heard the gunshot. It was a few minutes after 12:30 p.m., or it was "12:40ish"—probably closer to 12:30 p.m., though, since she was still standing in her sister's driveway before going into the house. She remembered feeling annoyed upon hearing the gun go off, because she was not a gun person and she had moved to Mossville Road, away from the rural hunting area where she formerly resided, for the very purpose of getting away from gunfire. She was able to determine, from a text message, that she left her sister's house at 12:47 p.m.

¶ 42                          K. Defendant's Statements to the Police

¶ 43             Upon arriving at 700 West Mossville Road in response to a reported burglary, Officer Linthicum saw a man standing on a driveway across the street, at 703 West Mossville Road. It was defendant. Linthicum asked him if he was the one who had called, and defendant answered yes. Linthicum entered the Newton house. When he saw the victim lying on the floor in a pool of coagulating blood, he backed out of the house. He went to his squad car and pulled it forward. Then he took a bulletproof shield out of the trunk and stood behind the shield, with his pistol drawn, awaiting the arrival of other police officers. While Linthicum waited there several minutes in his defensive posture, defendant just stood in the neighbor's driveway, asking no questions.

¶ 44    After backup arrived and the Newton house was cleared, Linthicum looked for defendant. He went across the street and knocked on the door of the neighbor's house. Linthicum's testimony continued:

> "The resident invited me inside. I began asking [defendant] some questions, and the resident asked us to come to the back of the home where a young female was. [Defendant] said that that was his youngest daughter.
>
> Q. All right. At that time did you—did the defendant ask you any questions as to what had occurred or what you had done?
>
> A. No, sir.
>
> Q. Did he inquire at all about what you had located when you were in the house?
>
> A. No, sir.
>
> Q. Describe his demeanor.
>
> A. As I'm speaking to him, he never showed any sort of emotion or asked any questions of me as to what was going on."

¶ 45    Detective Leigh testified that, after his initial interview of defendant on February 14, 2013, he met with defendant three more times over the next several weeks and that never once did defendant ask him "if [he] had any leads" or "pieces of evidence that might lead to someone being responsible for his wife's death."

¶ 46    Peoria Police Detective Steve Garner testified, "[W]e were at 703 Mossville [on February 14, 2013]. [Defendant] decided to ride with me in my police car, unmarked car, back to the Police Station to continue an interview." Before leaving with Garner, defendant removed from

his dark gray Chrysler Pacifica his "wallet, some checks, some passports, and some foreign money." Garner continued:

> "[W]e headed eastbound on Mossville. Approximately about a half mile down the street, we passed Robinson Park. ***
>
> Q. As you were riding up to Robinson Park, were you asking any questions of the defendant?
>
> A. No, I did not.
>
> Q. And when you got to that area, what did the defendant say?
>
> A. He said, 'The car is gone.'
>
> Q. Is that in response to anything you had said?
>
> A. I asked him no questions."

¶ 47        At the police station, defendant characterized the missing .40-caliber Glock pistol as his primary gun, which he had kept locked in a case. He denied having a spare key to the victim's Ford Focus. He represented there was only one key to that vehicle. He offered no explanation when the police informed him that the victim's car key had been found under her body. He said he did not know how it would be possible that the victim's Ford Focus and his Chrysler Pacifica were at Robinson Park at the same time. He admitted parking his Chrysler Pacifica at the park that day, before coming to the house. He explained, however, that he merely had pulled over to take a call from a Lithuanian woman in Chicago named Aina. He denied having an affair with this woman. He insisted that, all day long, he had been dressed just as he was dressed at the time of the interview.

¶ 48        The police questioned defendant about a Band-Aid on his hand, apparently suspecting a slide bite from the Glock pistol. Defendant claimed it was an old injury from a

treadmill but that the day of the interview, February 14, 2013, was when he first put a Band-Aid on it. He represented it had been two weeks since he last fired the Glock.

¶ 49                    L. Jailhouse Admissions to a Fellow Inmate

¶ 50        The State called David Smith, who testified he was serving a sentence of 14 years' imprisonment for a drug offense. He disclosed, on direct examination, that, in return for his cooperation in testifying against defendant, (1) his 14-year prison term would be reduced to 10 years and (2) another drug case pending against him would be dismissed.

¶ 51        Smith further testified as follows. In April 2013, he and defendant were in the same area of the Peoria County jail. Because Smith was older and was reputed to be knowledgeable in legal matters, defendant sought his legal advice. At first, defendant wanted to speak with Smith only in hypotheticals. Smith told defendant, however, that if he wanted Smith's help, he had to be completely honest and forthright. They agreed, on a handshake, that everything defendant said to Smith would be confidential. Defendant told Smith that the victim, his late wife, could be overbearing at times and that defendant had met a female student whose name sounded to Smith like Anna or Lana. Defendant decided to make a sort of Valentine's Day present to this other woman by killing his wife. He considered poisoning his wife with insulin or potassium. Also, he did some research on how to obtain a silencer for his .40-caliber Glock pistol. The day of the murder, he did things so as to be able to account for his whereabouts. Then he parked his car at Robinson Park, walked to the house, hid inside, and waited for his wife to come home. Initially, he had a black hoodie on, but he took it off because he was worried that a lady had seen him as he was on his way to the house. He shot his wife in the left side of the head.

¶ 52        Smith took notes after each conversation he had with defendant. He approached the Peoria police with these notes, hoping to bargain for leniency. The police told him it would be

helpful if, additionally, the gun or some of the items from the house could be found. Smith then told defendant to write down all the items he had removed from the house. Smith explained to defendant that this list could be a way of implicating the so-called "real killer" should any of the missing items "pop[ ] up" in the community. Defendant wrote down a list of items, later admitted as People's exhibit No. 93, and gave it to Smith.

¶ 53        Defense counsel declined to cross-examine Smith.

¶ 54        Katelyn Bruno was a forensic document examiner with the Federal Bureau of Investigation Laboratory Division in the Questioned Documents Unit in Quantico, Virginia. She opined that People's exhibit No. 93 was in defendant's handwriting.

¶ 55                                    II. ANALYSIS

¶ 56        To survive the State's motion for dismissal, defendant's amended petition for postconviction relief had to "make a substantial showing of a deprivation of rights under either the United States or Illinois Constitution[ ] or both." *People v. Dupree*, 2018 IL 122307, ¶ 28. We decide *de novo* whether the amended petition makes such a showing. See *People v. Young*, 2022 IL App (1st) 210534, ¶ 41. In our independent, non-deferential review, we assume the truth of all well-pleaded factual allegations in the amended petition that are not positively rebutted by the record. See *People v. Domagala*, 2013 IL 113688, ¶ 35. "Well-pleaded facts"—a term borrowed from civil procedure—are specific allegations of fact as opposed to mere conclusory assertions. See *Primax Recoveries, Inc. v. Atherton*, 365 Ill. App. 3d 1007, 1010 (2006). The question is whether the unrebutted factual allegations in defendant's amended petition, "liberally construed in favor of the petitioner and taken as true" (*People v. Sanders*, 2016 IL 118123, ¶ 31), "establish or 'show' a constitutional violation" (*Domagala*, 2013 IL 113688, ¶ 35). "[T]he 'substantial showing' of a constitutional violation that must be made *** is a measure of the legal sufficiency

of the petition's well-pled allegations of a constitutional violation, which[,] if proven at an evidentiary hearing, would entitle [defendant] to relief." (Emphasis omitted.) *Id.*

¶ 57 In his amended petition, defendant invokes a well-recognized constitutional guarantee. Under the United States and Illinois Constitutions, a defendant has the right to receive effective assistance from trial counsel. *People v. Peterson*, 2017 IL 120331, ¶ 79 (citing U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8). "[E]ffective assistance of counsel refers to competent, not perfect, representation." *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). To establish that trial counsel rendered ineffective assistance, the defendant must convince the court that both of the following propositions hold true: (1) counsel's performance "fell below an objective standard of reasonableness," and (2) there is a "reasonable probability *** that, but for counsel's errors, the result of the proceeding would have been different," which is to say, more favorable to the defendant. *Id.* To establish a "reasonable probability," a defendant has to do more than show that the deficient performance had "some conceivable effect on the outcome." *Strickland v. Washington*, 466 U.S. 668, 693 (1984). On the other hand, a defendant need not go so far as to show that the deficient performance would have "more likely than not altered the outcome." *Id.* Instead, a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

¶ 58 The amended petition raises 12 alleged omissions by defense counsel that, according to the amended petition, had the cumulative effect of rendering counsel's performance constitutionally ineffective.

¶ 59 A. Not Cross-Examining Smith

¶ 60 First, the amended petition criticizes defense counsel for declining to cross-examine Smith and for thereby passing up opportunities to impeach him. Defendant

acknowledges that, on direct examination, the prosecutor brought out some unfavorable facts about Smith. The prosecutor elicited from Smith that he was serving a 14-year prison term, which, in return for his cooperation in testifying against defendant, would be reduced to 10 years. In addition, according to Smith's testimony on direct examination, the State would dismiss a drug case that was pending against Smith.

¶ 61　　　　　Defendant argues that, despite these preemptive disclosures, room for impeachment remained. A cross-examination of Smith could have revealed the full seriousness of the charges the State had agreed to dismiss: possession of firearm ammunition by a felon, possession of heroin with the intent to deliver it, and simple possession of heroin by an individual who had prior convictions of Class 1, Class 2, and Class X felonies. Defense counsel could have brought out the imminence of Smith's release from prison as a result of his cooperation agreement with the State. Defense counsel could have had Smith admit his complete criminal history, including three convictions of aggravated kidnapping. Defendant further argues that, by declining to cross-examine Smith, defense counsel squandered an opportunity "to probe the source of Smith's purported information" or to expose some unspecified "inconsistencies in his stories."

¶ 62　　　　　Defendant notes that "[m]uch of the evidence that Smith allegedly obtained from [defendant] was in the news at the time, and/or was addressed in public hearings." Petitioner's exhibit No. 6 of the amended petition is a newspaper article by Andy Kravetz titled "Another Woman Might Have Led to Valentine's Day Slaying," which was published in the Chillicothe Times-Bulletin on March 12, 2013. This article reports on defendant's bond hearing, which was held on March 7, 2013. Some of the information that Smith testified he had learned from defendant is indeed in this article: for example, that defendant had an affair with a Lithuanian woman named Aina, that the victim died of a single gunshot wound to the head, that the murder weapon was a

Glock .40-caliber pistol, that a neighbor had seen defendant walking on Mossville Road toward the house, and that the computer contained internet search queries on how to silence a .40-caliber Glock pistol and how to kill someone with insulin or by electrocution in a bathtub.

¶ 63 Even so, Smith testified to details that were not in the newspaper article or in the transcript of the bond hearing. Neither of those sources appear to mention poisoning by potassium (another subject of an internet search query). Nor do they appear to mention that the victim was shot in the left side of the head. Nor do they appear to mention that defendant wore a black hoodie and that he took it off because he feared a woman had seen him as he walked to the house. Nor do they appear to mention that defendant did things throughout the day to make it seem as if he were somewhere else. What made Smith's testimony "extremely damaging," as defendant puts it, was Smith's knowledge of these details—knowledge that, evidently, he could have acquired only from defendant as he recounted to Smith how he had gone about committing the murder. The inventory of removed items, in defendant's own handwriting, tends to increase the likelihood that Smith was defendant's confidant to whom defendant would confess a murder.

¶ 64 Thus, although the direct examination made clear, from the outset, that Smith was a felon and a snitch, other evidence dovetailed with his testimony and tended to validate it. Establishing, by cross-examination, that Smith was even more of a felon and that the deal the State had offered him was especially tantalizing would not have weakened the force of this confirmatory evidence. Therefore, we conclude that cross-examining Smith would have yielded no reasonable probability of an acquittal. See *Palmer*, 162 Ill. 2d at 476; *People v. Johnson*, 2021 IL 126291, ¶ 53 (remarking that "if it is easier to dispose of an ineffective-assistance claim on the ground that it lacks a showing of sufficient prejudice, a court may proceed directly to *Strickland*'s prejudice prong and need not determine whether counsel's performance was deficient").

¶ 65        B. Not Objecting to People's Exhibit No. 93, the List of Removed Items

¶ 66        Second, the amended petition faults defense counsel for failing to object to People's exhibit No. 93, or to move for the suppression of this exhibit, pursuant to *Massiah v. United States*, 377 U.S. 201 (1964). In *Massiah*, the defendant was indicted for drug offenses, a lawyer appeared on his behalf, and the defendant was released on bail. *Id.* at 202. Afterward, a government agent persuaded a codefendant to elicit incriminating statements from the defendant while the government agent listened *via* a radio transmitter hidden under the front seat of the codefendant's automobile. *Id.* at 202-03. The Supreme Court held that the defendant "was denied the basic protections of [the sixth amendment (U.S. Const., amend. VI)] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206. In other words, when an indicted defendant was free on bail, the sixth amendment would not allow the police to do, through a confidential agent, what the police would have been forbidden to do in the police station: deliberately elicit an incriminating statement from the defendant in his lawyer's absence. See *id.* Because the confidential agent had been enlisted and sent by the police, he was, for sixth-amendment purposes, merely a stand-in for the police.

¶ 67        Defendant maintains that his own case is similar to *Massiah*. On March 7, 2013, in his bond hearing, defendant appeared with his lawyer. In the jury trial, Smith testified that, in March and April 2013, in the Peoria County jail, defendant sought legal advice from him and made incriminating statements to him. At some point, Smith approached the Peoria police department with the notes he had made of his conversations with defendant. A detective "advised" Smith that it "would help if they could come up with this gun or some of these items" (to quote Smith's testimony). Consequently, Smith "told [defendant] that he needed them items that he took out of

the house." Accordingly, defendant "wrote down [the] stuff" in People's exhibit No. 93, "saying that [these were] the items that [were] taken out of the place."

¶ 68        In defendant's view, the remark that the Peoria police made to Smith—that it "would help if they could come up with this gun or some of these items"—is comparable to what the police did in *Massiah*: sending a confidential agent with a wire. Therefore, defendant criticizes defense counsel for failing to file a motion for suppression on the authority of *Massiah*. "At the very least," defendant argues, "the motion to suppress should have been granted regarding the list Smith obtained from [defendant]," People's exhibit No. 93. Defendant suggests that, because of the lack of such a motion and because of defense counsel's failure to even cross-examine Smith, "it is unclear from the record what other portions of Smith's testimony should have also been suppressed."

¶ 69        Considering that defendant took a direct appeal, it is unclear why he waited until this postconviction proceeding to raise a *Massiah* claim. "[I]ssues that could have been raised on direct appeal, but were not, are forfeited." *People v. English*, 2013 IL 112890, ¶ 22. If "[a]ll of the facts supporting [a] claim were present in the record" and, thus, were "available on direct appeal," failure to raise the claim on direct appeal will result in a forfeiture of the claim later on, in a postconviction proceeding. *People v. Simms*, 192 Ill. 2d 348, 365 (2000); see also *People v. Williams*, 2019 IL App (3d) 160412, ¶ 34 (holding that "[c]ollateral review is appropriate for deciding ineffective assistance claims if the necessary facts are not in the trial record"). The supreme court has instructed us that when we begin reviewing a case, our second most important task, after ascertaining our jurisdiction, is to "determine which issue or issues, if any, have been forfeited." *People v. Smith*, 228 Ill. 2d 95, 106 (2008). If a postconviction claim cites only evidence that was in the record at the time of the direct appeal, this lack of reliance on new evidence suggests

a forfeiture. In arguing that defense counsel rendered ineffective assistance by failing to move, on the authority of *Massiah*, for the suppression of People's exhibit No. 93, defendant does not cite evidence that previously was outside the record. Rather, he cites the jury-trial testimony of Smith. Evidently, then, this claim could have been raised on direct appeal. Therefore, this claim is forfeited. See *English*, 2013 IL 112890, ¶ 22.

¶ 70      C. Not Moving to Suppress Diane Parrish's Pretrial Identification of Defendant

¶ 71      Third, the amended petition claims that when Diane Parrish made her pretrial identification of defendant, the photographic lineup was unduly suggestive. See *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 33. The amended petition accuses defense counsel of rendering ineffective assistance by failing to move, on the ground of suggestiveness, for the suppression of this pretrial identification. Defendant gives the following reasons for his characterization of the photographic lineup as unduly suggestive. "The photo lineup was administered by the investigating officers, [defendant] was the first photo in the lineup, and he was the only person in the lineup wearing a dark hooded jacket where the suspect was reportedly wearing a dark hooded sweatshirt."

¶ 72      These allegedly suggestive circumstances were evident from the record at the time of the direct appeal. In the jury trial, Leigh testified that he was "the lead detective in this investigation" and that on February 16, 2013, he met with Diane Parrish and showed her a photographic lineup, People's exhibit No. 73A, which he had "put together." People's exhibit No. 73A is in the record, having been admitted in evidence in the jury trial. It is a photographic lineup made up of six photographs arranged in two rows of three and numbered one to six. Defendant's photograph is No. 1, and he appears to be wearing a hooded jacket with the hood down. None of the men in the other five photographs appears to be wearing a jacket or hooded garment. Thus, at the time of the direct appeal, the record afforded the means of arguing the suggestiveness of the

photographic lineup. The record on direct appeal equipped defendant to make the argument he makes now: that defense counsel rendered ineffective assistance by failing to move for the suppression of the pretrial identification on the ground of undue suggestiveness. Therefore, this claim of ineffective assistance likewise is forfeited. See *English*, 2013 IL 112890, ¶ 22.

¶ 73                           D. Not Impeaching Diane Parrish

¶ 74          Fourth, the amended petition criticizes defense counsel for failing to impeach Diane Parrish with her prior inconsistent statement to the police. Peoria Police Officer Roberto Vasquez interviewed Diane and Robert Parrish on February 14, 2013. According to Vasquez's police report, which is attached to the amended petition, Diane Parrish at first told him that the man she saw walking on the side of the road was African-American. A few hours later, according to his report, Vasquez returned to the Parrishes' house, and Diane Parrish answered the door. Vasquez continues in his report:

> "I explained [to her] I wanted to go over the description of the male one more time. Diane stated, 'Oh, yeah. It was a white guy.' I asked Diane if she was sure, as she had told me that it was a black male earlier. Diane stated that she had gotten a better look at the male tha[n] Robert, who was now in bed. Diane stated she and Robert had argued over the fact that she thought the male was white and he thought the male was black as they had driven past him earlier. Diane said the male appeared to have a tan though."

¶ 75          On cross-examination in the jury trial, defense counsel asked Diane Parrish:

> "Q. And did you—you said that you never told the officer that you thought he was black?
>
> A. No, I never did.

Q. You told them from the beginning that he was white?

A. Correct."

In his amended petition, defendant criticizes defense counsel for failing to call Vasquez and to impeach Diane Parrish with evidence that, contrary to her denial on cross-examination, she originally described the pedestrian as African-American.

¶ 76     The supreme court has said:

"Generally, the decision whether or not to *** impeach a witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel. [Citation.] The manner in which to cross-examine a particular witness involves the exercise of professional judgment which is entitled to substantial deference from a reviewing court. [A] [d]efendant can only prevail on an ineffectiveness claim by showing that counsel's approach to cross-examination was objectively unreasonable." *People v. Pecoraro*, 175 Ill. 2d 294, 326-27 (1997).

It was objectively unreasonable of defense counsel not to impeach Diane Parrish by calling Vasquez. We are unable to envision any strategic reason for not calling Vasquez to testify that Diane Parrish initially told him the pedestrian was African-American. We can see no downside to calling Vasquez.

¶ 77     Nevertheless, "[t]he value of the potentially impeaching material must be placed in perspective." *People v. Jimerson*, 127 Ill. 2d 12, 33 (1989). Calling Vasquez would have had *some* value for the defense, but the value would have been only in creating a factual dispute. At trial, Diane Parrish denied ever telling the police that the pedestrian was African-American. She had argued with her husband because he had thought the pedestrian was African-American whereas she had thought the pedestrian was Caucasian. Only two days after speaking with Vasquez, she

identified defendant, a Caucasian, in a photographic array. Even though it would have been unclear—a question of fact—whether Diane Parrish really made a prior inconsistent statement to Vasquez or whether Vasquez initially misunderstood her, defense counsel had nothing to lose from calling Vasquez. His failure to call him is inexplicable. Given the strong evidence of guilt, however, and the conflicting evidence as to what Diane Parrish originally told Vasquez, the failure to call Vasquez does not shake our confidence in the verdict. See *Strickland*, 466 U.S. at 694.

¶ 78                                 E. Not Calling Robert Parrish

¶ 79          Fifth, the amended petition asserts that defense counsel rendered ineffective assistance by failing to call Robert Parrish to testify that the pedestrian was African-American. On cross-examination in the jury trial, though, defense counsel asked Diane Parrish, "And your husband, Dr. Parrish, thought it was a black man?" and she answered, "That's correct." Thus, it was apparent, from the record on direct appeal, that Robert Parrish, unlike Diane Parrish, thought the pedestrian was African-American. The police report by Vasquez, attached to the amended petition, adds nothing to that aspect of Diane Parrish's testimony. According to the police report, Diane Parrish told Vasquez that she and Robert Parrish "had argued over the fact that she thought the male was white and he thought the male was black as they had driven past him earlier." Because the record enabled defendant to claim, on direct appeal, that defense counsel rendered ineffective assistance by not calling Robert Parrish to testify that he thought the pedestrian was African-American, this claim is forfeited. See *English*, 2013 IL 112890, ¶ 22.

¶ 80                               F. Not Presenting a Timeline Exhibit

¶ 81          Sixth, the amended petition criticizes defense counsel for forgetting to present a timeline exhibit he had prepared for the purpose of casting doubt on the State's timeline. The State's theory was that before murdering his wife, defendant tried to build a plausible alibi by

stopping at various places that had video surveillance systems—but that, despite these stops, he had the time and opportunity to commit the murder.

¶ 82 The prosecutor laid out the timeline in his closing argument. At 9:20 a.m., on February 14, 2013, defendant went to Chase Bank, where, the prosecutor noted, defendant did not appear to do anything but get his face on camera. At 10:20 a.m., defendant returned to Chase Bank and withdrew some Iraqi currency from a safety deposit box. At 10:40 a.m., he entered Huck's. At 11 a.m., he entered the Starbucks on Knoxville Avenue. He left Starbucks at 11:30 a.m. At 12:05 or 12:10 p.m., the victim left home with Janelle, to take her to kindergarten, just down the road. According to the testimony of an instructor at the daycare, Lundquist, the victim arrived at the daycare at 12:15 p.m. and left at 12:20 p.m. The prosecutor suggested that the time between about noon and 12:20 p.m. would have been the perfect time to stage a burglary. At 12:20 p.m., Diane Parrish saw defendant walking from the direction of Robinson Park toward his residence. The State's theory was that defendant had left his car parked at Robinson Park, which was a minute's drive from his residence, and that he then walked the half-mile to his residence. The prosecutor argued that when the victim entered the house, defendant was waiting for her and shot her. Skehan-Passie testified that she heard a gunshot between 12:30 p.m. and 12:40 p.m. or at "12:40ish." Immediately after shooting the victim, defendant, who had the extra set of keys to her van, drove her van to the park, left the van there, and threw the keys into a trash can in the park. Then he drove his own vehicle from the park to Starbucks—about a seven-minute drive—where he got his face on camera at 12:45 p.m. This was the State's theory and timeline.

¶ 83 Defense counsel argued to the jury that, "for the State to say that [defendant] did it, you'd have a pretty tight timeline, particularly if you're talking about staging a burglary." Defense counsel continued:

"[W]e know that he's at Starbucks at 12:45, so, you know, you work backwards, and it would have to be a pretty precise drill, and I would suggest that that's not logical. It's not practical. It's not possible.

Let me ask you this: What if [the victim's] car when they drove out was still in the garage getting loaded up with stuff? That would throw their whole timeline off."

¶ 84　　　In his amended petition for postconviction relief and attached affidavit, defendant alleges that defense counsel discussed with him a timeline exhibit that defense counsel had prepared and which detailed the evidence of defendant's various locations on the day the victim was murdered. According to defendant's brief, this timeline was calculated to show it was impossible, or at least highly improbable, that defendant "could have walked to the house, killed [the victim], ransacked multiple rooms of the house, broken a window, changed his clothing, driven [the victim's] car to the park, and driven to Starbucks, where he was observed on camera, in the timeframe established by the State." In the jury trial, however, defense counsel never presented this timeline exhibit. To quote from the affidavit by defendant, defense counsel told him, " 'Oh, I guess I forgot. Oh well, you always have the appeal.' " In his amended petition, defendant claims that defense counsel rendered ineffective assistance by forgetting to present this timeline exhibit. "Decisions regarding *** what evidence to present are matters of trial strategy" (*People v. Drain*, 2023 IL App (4th) 210355, ¶ 59), but, arguably, *forgetting* to present an exhibit is neither a decision nor a strategy.

¶ 85　　　Writing pads had been provided to the jury, however, and the jury was capable of making its own timeline. Insomuch as the timeline exhibit would have stated, in a different form, evidence that already had been presented to the jury, this demonstrative exhibit would have created

no reasonable probability of a different outcome. Therefore, defendant has failed to show prejudice from defense counsel's inadvertent failure to introduce the timeline exhibit. See *Palmer*, 162 Ill. 2d at 476.

¶ 86          G. Not Mounting a Vigorous Enough Challenge to the DNA Evidence

¶ 87          Seventh, the amended petition complains that defense counsel "failed to effectively cross-examine the State's forensic expert," Debra Minton, "regarding the significance of the partial [DNA] profile, asking only one vaguely worded question about the potential for the partial profile to include 'a whole bunch of other people' who could not be excluded." The amended petition adds that appellate counsel rendered ineffective assistance by failing to raise this issue on direct appeal.

¶ 88          The Fourth District has explained:

> "Claims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel. [Citation.] That is, a defendant who contends appellate counsel rendered ineffective assistance must show (1) the failure to raise an issue on appeal was objectively unreasonable and (2) that decision prejudiced the defendant. [Citation.] Unless the underlying issue is meritorious, a defendant suffers no prejudice from counsel's failure to raise the issue on appeal. [Citation.]" (Internal quotation marks omitted.) *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 66.

We note that trial counsel's cross-examination of Minton takes up four pages in the trial transcript and that his recross-examination of her takes up another page. To show that the underlying issue is meritorious, defendant would have to (1) specify the additional questions that trial counsel should have asked in his cross-examination of Minton and (2) prove what answers she likely would

have given. Defendant does neither of those things. Therefore, he has failed to show that the underlying issue is meritorious, and we find no prejudice. See *Palmer*, 162 Ill. 2d at 476.

¶ 89                              H. Not Moving for a DNA Database Search

¶ 90          Eighth, the amended petition criticizes defense counsel for "not fil[ing] a motion to run a DNA database search for the partial DNA profile." The record does not appear to reveal what, if anything, this DNA database search would have revealed. "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." (Internal quotation marks omitted.) *People v. Johnson*, 2021 IL 126291, ¶ 55; see also *People v. Loera*, 250 Ill. App. 3d 31, 52 (1993) (holding that "[a]s defendant has not shown any prejudice with regard to his claim of failure to investigate, defendant's ineffective assistance claim fails on this point").

¶ 91                              I. Not Making an Adequate Offer of Proof

¶ 92          Ninth, the amended petition claims that defense counsel rendered ineffective assistance by "failing to make an adequate offer of proof at trial regarding similar burglaries in the area to show that the burglary and murder in this case may have been related to that string of home invasions."

¶ 93          Defense counsel called two Peoria police officers, Chad Batterham and Timothy Moore, to testify regarding a series of home invasions and burglaries that happened in Peoria in 2013, after the murder. The prosecutor objected. Defense counsel made an informal offer of proof by summarizing what he expected that Batterham and Moore's testimony would show. See *People v. Roberson*, 401 Ill. App. 3d 758, 769 (2010) (explaining that "[w]hile a formal offer of proof is generally required, an informal offer of proof consisting of counsel's summary of what the proposed evidence might prove may be sufficient if specific and not based on speculation or

conjecture"). Even the prosecutor participated in making the offer of proof. The court asked questions of the attorneys. Finally, the court summed up:

"So I would conclude based at least upon what the parties have said so far that *** the home invasions *** all began to pop up or occur after this event; that they occurred in a subdivision or much more closely knit or closely situated places; that they occurred almost purposely in homes where people were expected to be present; and that part of the invading appeared to have a standard modus operandi that included tying up people, binding them, taunting them, speaking with them, taking their vehicles, and looting the home, stacking the cars with the loot, and then driving it to a convenient location to unload it. None of that appears to have any relevance of probative value here.

So unless, [defense counsel], you can tie it up with something greater than what we have already begun, *** I would certainly cut it off right about there."

Defense counsel added that after the vehicle was loaded up with the stolen goods, the "vehicle was found in a remote and convenient place shortly thereafter without anything in it" and that "the weapon used was a large caliber handgun." Defense counsel concluded:

"But that would—we have made our record, Judge. That's fine.

THE COURT: Okay. I would also indicate in all the other cases, it appeared to be multiple persons, at least three, sometimes four. Okay, I'll sustain the objection and ask *** we can either have this witness [(Batterham)] excused or you may wind up a little bit."

According to the amended petition, this informal offer of proof was "inadequate," and defense counsel should have "ask[ed] to *voir dire* the officers to create a record of the specific facts they

would have testified to." The problem is, we do not know the specific facts to which Batterham and Moore would have testified, beyond the facts in defense counsel's informal offer of proof. We cannot reasonably find defense counsel to be ineffective for failing to make a formal offer of proof if the record does not show what testimony he would have elicited by *voir diring* Batterham and Moore. See *People v. Enis*, 194 Ill. 2d 361, 380; *People v. Atherton*, 406 Ill. App. 3d 598, 619 (2010).

¶ 94                      J. Not Presenting Evidence to Contradict the Evidence

the State Found in its Search of Defendant's Computer

¶ 95          Tenth, the amended petition complains that "[n]o evidence was presented to contradict the State's evidence [regarding searches on defendant's computer], despite an expert being retained." Defendant continues, "Although defense counsel moved the court for funds to hire a digital forensic expert to review the hard drive taken from the computer and the State's report regarding the same, counsel never called the expert to testify." In his argument, however, defendant fails to cite an affidavit by this expert stating what he or she would have said on the stand. Therefore, "further review of the claim is unnecessary." *Enis*, 194 Ill. 2d at 380.

¶ 96          K. Inadequate Cross-Examination of the State's Digital Forensics Expert

¶ 97          Eleventh, the amended petition accuses defense counsel of rendering ineffective assistance by "fail[ing] to effectively cross-examine the State's expert regarding the dates and locations of the searches." Although defendant acknowledges that defense counsel "questioned the State's expert regarding the timing and location of the searches," defendant complains that defense counsel "failed to follow through when the expert testified that information was available in another exhibit." Absent an explanation of what this follow-through would have revealed, defendant has not shown prejudice. See *Palmer*, 162 Ill. 2d at 476.

- 30 -

¶ 98                    L. Not Objecting to People's Exhibit No. 110

¶ 99            Twelfth, the amended petition claims that defense counsel rendered ineffective assistance by not objecting to People's Exhibit No. 110, a summary of the internet searches that the State's expert had found on the hard drive of defendant's computer. Defendant argues "it was patently unreasonable for the jury to see searches that were irrelevant and unduly prejudicial, such as those related to pornography." We see no reason why this claim could not have been raised on direct appeal. Therefore, this claim is forfeited. See *English*, 2013 IL 112890, ¶ 22.

¶ 100                           III. CONCLUSION

¶ 101            For the foregoing reasons, we affirm the circuit court's judgment.

¶ 102            Affirmed.